UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-80396-CIV-MARRA/JOHNSON

SHERWIL TAFALLA and
JOEMAR SALES,

Plaintiff,

vs.

ALL FLORIDA DIALYSIS SERVICES,
INC., et al.,

Defendants.
_____/

## OPINION AND ORDER

This cause is before the Court upon Defendants Jose Arrascue and South Palm Beach

Nephrology, P.A.'s Motion for Summary Judgment (DE 90); Defendants All Florida Dialysis

Services, Inc. and Majella Wilbanks' Motion for Summary Judgment (DE 100) and Plaintiffs

Sherwil Tafalla and Joemar Sales' Motion for Summary Judgment (DE 103).  The motions are

fully briefed and ripe for review. The Court has carefully considered the motions and is otherwise

fully advised in the premises.

I.  Background

The facts, as culled from affidavits, exhibits, depositions, answers, answers to

interrogatories and reasonably inferred therefrom, for the purpose of this motion, are as follows:

All Florida Dialysis Services, Inc. ("All Florida") is a Florida corporation created in July

of 1998 by Majella Wilbanks ("Wilbanks"), a nurse who specializes in dialysis treatment, for the

purpose of providing dialysis services.[1]  (Wilbanks Dep. 8-9.)  South Palm Beach Nephrology, P.A. ("SPBN") is a physician practice which provides medical services to its patients related to kidney and kidney diseases.  It has been in business for more than 27 years and has six physician members, including Jose Arrascue, M.D. (Arrascue Dep. 5, 8; Arrascue Decl. ¶ 4.)  Dr. Arrascue is on the medical staff of several area hospitals, including JFK Medical Center ("JFK"). (Arrascue Decl. ¶ ¶ 2-4.)  Plaintiffs Sherwil Tafalla ("Tafalla") and Joemar Sales ("Sales") are both registered nurses.  (Third Am. Compl. ¶ 11.)

In approximately 2001, JFK began to expand its medical services to include the provision of dialysis treatment to its patients.  The hospital approached Dr. Arrascue, as managing member of SPBN, to see if SPBN was interested in operating the new dialysis unit.  JFK and SPBN thereafter entered into a contract in which SPBN would operate the new dialysis unit at JFK. The JFK contract renewed until 2007, when dialysis services were taken over by another company. (Arrascue Decl. ¶ 5; Arrascue Dep. 10-11.)   The dialysis unit was owned by JFK. (Arrascue Dep. 86.)  Dr. Arrascue testified that the SPBN's contract with JFK was exclusive and required that SPBN provide dialysis coverage 24 hours a day, seven days a week. (Arrascue Dep. 15, 92, 103-04.)

Dr. Arrascue met Ms. Wilbanks while she was working as a dialysis nurse at Delray Medical Center, where Dr. Arrascue also holds medical staff privileges. (Arrascue Dep. 11; Wilbanks Dep. 22.)  In 2001, shortly after SPBN entered into the JFK contract, SPBN, through

---

[1] All Florida's gross income from 2004-2006 was less than $500,000.00 (Federal Income Tax Returns, Ex. B, C, D to Wilbanks Dep.)  Mr. Sales seeks the alleged unpaid overtime payments from the period of June 2005 through March 2007.  (Sales Decl. ¶ 3.)  Ms. Tafalla seeks the alleged unpaid overtime payments from the period of July 2006 through March 2007. (Tafalla Decl. ¶ 4.)

Dr. Arrascue, approached All Florida, through Wilbanks, to see if her company was interested in handling the dialysis treatment at the JFK unit. (Arrascue Dep. 12-14; Arrascue Decl. ¶ 7; Wilbanks Dep. 71-72.)

SPBN and All Florida entered into a verbal agreement for All Florida to provide the nursing staff for dialysis treatments at the JFK unit.  All Florida was the only company used by SPBN to provide dialysis services at JFK and SPBN could have terminated its contract with All Florida at any time.  (Arrascue Dep. 88, 112; Wilbanks Dep. 36, 38, 103-04.)  Pursuant to their agreement, SPBN would pay a flat amount per treatment to All Florida as well as a fee for being on call on a daily basis.[2] (Arrascue Dep. 14-19; Arrascue Decl. ¶ 7; Randolph Dep. 18-19; Wilbanks Dep. 198-99.)   All Florida would also serve patients whose doctors were not part of SPBN. (Wilbanks Dep. 25.)

 At first, there was a limited number of dialysis treatments on the JFK unit, and Ms. Wilbanks handled them herself.  As the unit grew, however, she began to bring in other dialysis nurses to provide these treatments.  Dr. Arrascue did not know who Ms. Wilbanks hired to work as dialysis nurses.  Dr. Arrascue was not involved in the hiring of any staff for the dialysis unit, and he never discussed with Ms. Wilbanks her decision whom to hire. (Arrascue Dep. 16-17; Arrascue Decl. ¶ 8.)

While Ms. Wilbanks was working as a dialysis nurse at JFK, she met Mr. Sales. Mr. Sales was employed as a nurse at the hospital and asked Ms. Wilbanks if she would train him to

---

[2] Specifically, SPBN paid All Florida a flat amount of $120.00 for hemodialysis treatment, $200.00 for plasmapheresis treatments and $30.00 for being on call. SPBN received, in return, more than those amounts from JFK. (Arrascue Decl. ¶¶ 6-7; Randolph Dep. 18-19.)

be a dialysis nurse. Mr. Sales began working part time for All Florida while Ms. Wilbanks trained him, and he was paid per patient treatment.  In September of 2005, Mr. Sales requested that Ms. Wilbanks switch him to an hourly rate. (Sales Dep. 10, 82, 93-94; Wilbanks Dep. 40-45.)  Ms. Wilbanks also met Ms. Tafalla at JFK.  Ms. Tafalla also asked Ms. Wilbanks to train her to be a dialysis nurse.  Ms. Tafalla began working part time for All Florida. She thereafter resigned from JFK and began working full time with All Florida in July of 2006 and was paid an hourly rate. (Tafalla Dep. 106-07, 131, 144; Wilbanks Dep. 145-46.)  When discussing the possibility of a pay raise, Ms. Tafalla discussed it with Ms. Wilbanks, not SPBN. (Tafalla Dep. 226-27.)

   The dialysis nurses would arrive for work and clock in on All Florida's time clock. If a nurse had a question, or if there were any problems with the machines, they would contact Ms. Wilbanks. On the other hand, if a matter arose concerning patient care, the nurse would contact that patient's physician. (Sales Dep. 19-20; Tafalla Dep. 146-49.)  The work schedules for All Florida nurses were posted monthly by Ms. Wilbanks. Nurses would write their names on the dates they wished to work and, if needed, Ms. Wilbanks would ask nurses to cover other dates. (Sales Dep. 54-55; Tafalla Dep. 136-39.)  Similarly, nurses would indicate on the schedule which nights they were willing to work "on call." (Wilbanks Dep. 148-49.)

   All Florida used Paychecks as its payroll company. All Florida provided timecards for its staff which were kept on the JFK unit. After reviewing the timecards, Ms. Wilbanks would calculate the amounts due to each nurse and then call Paychecks to instruct them how much to pay each nurse.  Paychecks would then direct deposit money into the accounts of the nurse. (Wilbanks Dep. 55-56, 60-62.)

SPBN did not determine the number of nurses needed to work, or which nurses should be assigned to which patients.  If the unit needed more dialysis nurses, Ms. Wilbanks would make that decision.  If Ms. Wilbanks was not there, the nurses themselves would contact fellow nurses to come in.  (Arrascue Decl. ¶ 9; Wilbanks Dep. 113, 129-32.)   Neither SPBN nor Dr. Arrascue were involved in the hiring decisions of All Florida. When Sales and Tafalla were hired by All Florida, they each interviewed with Ms. Wilbanks and no one else. (Arrascue Decl. ¶ 8; Sales 78, 81-82; Tafalla 131, 215.)  Neither Sales nor Tafalla ever spoke with anyone at SPBN regarding their schedule, the hours they worked, or their pay. (Sales Dep. 82-83, 93-95; Tafalla Dep. 131, 226-27.)

Ms. Wilbanks testified that when the nurses at All Florida asked for an increase in wages, she would ask Dr. Arrascue for an increase in rates for performing each procedure. (Wilbanks Dep. 87-88.)  Dr. Arrascue was the decision maker on whether the rates paid to All Florida would be increased.  (Wilbanks Dep. 87-88.)  Mr. Sales and Ms. Tafalla testified that when they asked Ms. Wilbanks for a raise, she responded that she would have to check with Dr. Arrascue. (Sales Dep. 64; Tafalla Dep. 252.)

Ms. Wilbanks would supervise Mr. Sales and Ms. Tafalla, although SPBN directed their work in the context of medical decisions. (Sales Dep. 77, 80-81; Tafalla Dep. 147-49; 152-53.) Both Mr. Sales and Ms. Tafalla received written evaluations prepared by Ms. Wilbanks, who signed the evaluator as "supervisor."  The evaluations were also signed by JFK's ICU director. (Sales Dep. 110-13, 121; Tafalla Dep. 239-40; Wilbanks Dep. 206.)  At times, Dr. Arrascue would share with Ms. Wilbanks good feedback that he heard from the hospital about the service provided to the dialysis patients. (Arrascue Dep. 55.)   Dr. Arrascue never discussed with Ms.

5

Wilbanks what she paid her dialysis nurses.  (Arrascue Dep. 82, 98-99.)

Dr. Arrascue testified that he participated "in a lot of the issues" pertaining to ordering equipment and supplies for the dialysis unit (Arrascue Dep. 31-32.)  But he also testified that he would talk to Ms. Wilbanks "infrequently" and no more than "once every few weeks, if at all." The communication was "primarily about patient care" and "not about the running of the program." (Arrascue Dep. 47.)   Dr. Arrascue would discuss with Ms. Wilbanks the need to buy another machine, the water system or the need to change filters. (Arrascue Dep. 47.)  Dr. Arrascue was present at the dialysis unit "maybe one week a month." (Arrascue Dep. 48.)

All Florida did not provide its own supplies to the JFK unit. When supplies were needed, Ms. Wilbanks would send an inventory order form by facsimile to SPBN, who would then make arrangements to obtain the supplies. The JFK contract identified what equipment/machines JFK would provide, and which were to be provided by SPBN. For example, JFK provided the "Baxter" dialysis machines, whereas SPBN provided the "Fresenius" dialysis machines. (Rudolph Dep. 41; Contract, Ex. 10 to Arrascue Dep.; Wilbanks Dep. 90.)   However, in 2004, SPBN started buying machines for the provision of dialysis services at JFK and hired a technician to do the maintenance of the equipment. (Arrascue Dep. 35-36.)  When All Florida needed more dialysis supplies, Ms. Wilbanks would talk to Dr. Arrascue or contact Ms. Rudolph at SPBN by telephone or facsimile.  SPBN would order or pay for the dialysis supplies. (Arrascue Dep. 31-32; Rudolph Dep. 38-41.)  All Florida did not purchase any medical supplies or equipment. (Wilbanks Dep. 40.)

In 2005, SPBN paid $107,794.63 for medical supplies and $8,205.32 for repairs and maintenance of dialysis equipment used by All Florida in the JFK dialysis unit. (Randolph Dep.

6

24-25; Ledger Report, Ex. 3 to Randolph Dep.)  In 2006, SPBN paid $83,315.34 for medical

supplies and $8,262.05 for repairs and maintenance of dialysis equipment used by All Florida in

the JFK dialysis unit. (Ledger Reports, Ex. 5 & 6 to Randolph Dep.)  In 2006, SPBN paid for All

Florida's holiday party. (Randolph Dep. 32-33.)  SPBN paid for the background investigation of

All Florida's dialysis nurses, which was required and conducted by JFK hospital. (Arrascue Dep.

106-07.)  SPBN paid for professional liability insurance for the provision of dialysis services

under the JFK contract, but did not pay for workers' compensation insurance. (Arrascue Dep. 21,

98-99.)  SPBN paid All Florida $1,208.39 in 2005 and $1,423.95 in 2006 to reimburse All

Florida for office supplies. (Rudolph Dep. 22; Ledger Reports, Ex. 2 and 4 to Rudolph Dep.)

        Dr. Arrascue was the doctor that Ms. Wilbanks would talk to when All Florida needed

something addressed by JFK, such as problems with patient transport to the unit and problems

with supplies and machines. (Wilbanks Dep. 29.)  Ms. Wilbanks characterized Dr. Arrascue as

"our advocate." (Wilbanks Dep. 96.)  Ms. Wilbanks testified that All Florida was "just doing the

nursing service" and that the nurses were "just the puppet[s] there to perform the procedure how

[the doctors] order it."  (Wilbanks Dep. 25.)

        Because All Florida was paying some of its dialysis nurses the same amount per

procedure that SPBN was paying All Florida, All Florida was not always making a profit.

(Wilbanks Dep. 74-76, 194.)  The pay period for All Florida was bi-monthly from the first to the

fifteenth of the month and then from the sixteenth to the end of the month. (Wilbanks Dep. 61,

181, 199.)  Twice monthly, All Florida would send SPBN a list of treatments provided. (Rudolph

Dep. 13.)  SPBN's Practice Administrator Cathleen Rudolph would verify the treatment list, and

based on that review, would calculate the amount to be paid to All Florida, prepare the check for

payment, and contact Ms. Wilbanks to advise the check was ready for pick-up. (Rudolph Dep. 13-15, 17-18, 36-38.)  For the years 2004 through 2006, SPBN was All Florida's only source of income. (Wilbanks Dep. 67.)   SPBN made a profit under the JFK contract, as it was paid more by the hospital than it paid All Florida. (Arrascue Dep. 107-08.)  When the JFK contract with SPBN was transferred to another company, All Florida no longer performed dialysis at JFK. (Arrascue Dep. 112; Wilbanks Dep. 36, 38, 103-04.)

Plaintiffs move for summary judgment on the following bases: (1) All Florida was a single enterprise with SPBN under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq.; (2) All Florida is liable as Plaintiffs' employer; (3)  SPBN is liable as Plaintiffs' joint employer; (4) Ms. Wilbanks and Dr. Arrascue are individually liable as employers under the FLSA; (5) All Florida and SPBN violated the FLSA and (6) Plaintiffs are entitled to liquidated damages.  Defendant All Florida and SPBN both seek a ruling that they do not qualify as joint employers. Alternatively, should the Court deny SPBN's motion for summary judgment, Dr. Arrascue seeks a ruling that he is not individually liable.

II.  Summary Judgment Standard

The Court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(c).  The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The Court should not grant summary judgment unless it is clear that a trial is unnecessary, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and any doubts in this

regard should be resolved against the moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323.  To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case.  Id. at 325.

After the movant has met its burden under Rule 56(c), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  According to the plain language of  Fed. R. Civ. P. 56(e), the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings," but instead must come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 587.

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim.  Anderson, 477 U.S. at 257.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).  If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." Anderson, 477 U.S. 242, 249-50.

III. Discussion

A.  Joint Employment

The overtime wage provisions of the FLSA apply only to workers who are "employees" within the meaning of the Act. 29 U.S.C. § 206(a)(1). Under the FLSA, an "employee" is defined as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). An "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). To "employ" is defined as to "suffer or permit to work." 29 U.S.C. § 203(g).  The FLSA requires employers to provide a minimum wage for employees and prohibits employers from employing a worker for more than 40 hours a workweek without providing compensation for the excess hours at a rate not less than one and one-half times the regular rate of compensation.  29 U.S.C. § § 206, 207(a)(1).

A determination of joint employment status under the FLSA is a question of law. Antenor v. D & S Farms, 88 F.3d 925, 929 (11th Cir. 1996).  The existence of a joint employment relationship turns on the "economic reality" of the relationship between the plaintiff and the putative employer, requiring courts to determine whether the surrounding circumstances show that the plaintiff is economically dependent on the putative employer.  Goldberg v. Whitaker House Co-op, Inc., 366 U.S. 28, 33 (1961); Aimable v. Long and Scott Farms, 20 F.3d 434, 439 (11th Cir. 1994); Lane v. Capital Acquisitions and Management Co., No. 04-60602, 2007 WL 676019, at * 4 (S.D. Fla. Feb. 28, 2007).  The Eleventh Circuit has identified the following factors for courts to consider in making the determination that an individual employee is economically dependent upon, and therefore employed by another entity: (1) the nature and degree of control of the alleged joint employer over the employee; (2) the degree of supervision

10

over work, either direct or indirect; (3) the right to hire, fire or modify the employment

conditions; (4) the power to determine the workers' pay or method of payment; (5) the

preparation of payroll and payment of wages; (6) the ownership of facilities where the work

occurred; (7) the performance of a job integral to the business and (8) the relative investment in

the equipment and facilities.  Antenor, 88 F.3d at 932; Amiable, 20 F.3d at 440-46.

Significantly, "a joint employment relationship is not determined by a mathematical formula."

Antenor, 88 F.3d at 933.  While courts consider each factor separately, the factors must

ultimately be weighed "collectively and qualitatively." Id.  Here, the basis for SPBN's liability

rests on a finding that SPBN was a joint employer with All Florida.  Moreover, without a finding

that SPBN is liable as a joint employer, there can be no individual liability for Dr. Arrascue.

With that in mind, the Court now considers the various factors as they relate to the facts of this

case.

     1.  Nature and degree of control

     The Eleventh Circuit has stated that control over an employee by a putative employer

exists when that employer determines the number of workers hired for a job, when work should

begin on a particular day, which workers should be assigned to specific tasks and whether a

worker should be disciplined or retained. Id.  The evidence shows that SPBN was not involved

in the hiring of any dialysis nurses. Instead, those decisions fell under the province of All Florida.

(Arrascue Dep. 16-17; Arrascue Decl. ¶ 8.)   Likewise, All Florida was responsible for setting the

work schedules of the dialysis nurses. (Sales Dep. 54-55; Tafalla Dep. 136-39.)  In fact, Plaintiffs

testified that they never spoke with anyone at SPBN regarding their schedule, the hours they

worked or rate of pay. (Sales Dep. 83, 94-95; Tafalla Dep. 227.)   They also testified that they

received written evaluations prepared by Ms. Wilbanks. (Sales Dep. 110-13; 121; Tafalla Dep. 239-40.)  Furthermore, Dr. Arrascue testified that he never discussed with Ms. Wilbanks what she paid the dialysis nurses. (Arrascue Dep. 82, 98-99.)   Based on this evidence, the Court finds that SPBN did not exercise control over Plaintiffs.

Plaintiffs disagree, both factually and legally.  Plaintiffs rely on Preston v. Settle Down Enterprises, Inc., 90 F. Supp. 2d 1267 (N.D. Ga. 2000) and contend that direct, on-site supervision is unnecessary to have sufficient control under this factor. (Pl. Mot. at 13.)  Preston concerned a temporary employment agency that claimed it was not a employer  because it had no control over the workers once they reached their job site.  The evidence before the Preston court showed that the temporary agency recruited, transported, paid and maintained records for the workers.  In addition, the agency selected workers to send to job sites, told the workers when the vans would arrive to take them to the job site and set the workers' pay rates. Clearly, the facts in Preston differ significantly from the facts before this Court.  In Preston, the temporary agency exercised substantial control over the temporary employees in a way not borne out by the evidence in the instant case.  Indeed, SPBN performed none of the indicia of control that existed in Preston (i.e., recruiting, record maintenance, payment to workers).

Plaintiffs also point to the record and claim it shows SPBN "effectively controlled" All Florida based on the following:  (1) All Florida only provided services to SPBN; (2) SPBN only used All Florida to provide dialysis services; (3) SPBN determined All Florida's hours by requiring round-the-clock coverage and (4) Dr. Arrascue participated in the running of the dialysis program.  To begin, there is nothing in the record to suggest that SPBN required All Florida to provide dialysis services to SPBN exclusively.  To the contrary, that was All Florida's

business decision.  The same can be said about SPBN's decision to use All Florida exclusively.

With respect to hours, the evidence showed that Ms. Wilbanks set the hours that her nurses

would work, not SBPN.  (Sales Dep. 54-55; Tafalla Dep. 136-39.)  The fact that the agreement

between SPBN and All Florida required round-the-clock coverage reflects nothing more than one

of the terms of the contract between these two corporate entities based upon SPBN's contractual

obligation to provide such service to JFK.  It does not speak to control over the employees of All

Florida by SPBN.  Lastly, in making their argument that Dr. Arrascue exercised control over the

running of All Florida, Plaintiffs take significant liberties with the record.  Read in its entirety,

the deposition testimony of Dr. Arrascue and Ms. Wilbanks show that Dr. Arrascue's role was

primarily to discuss patient care.  Indeed, other doctors who had patients being served by All

Florida also discussed patient care with the dialysis nurses at All Florida.

>    2.  Degree of supervision over the work

Supervision over work includes overseeing the work and providing direction on a regular,

even daily basis. Antenor, 88 F.3d at 935.  Here, Plaintiffs testified that no one from SPBN ever

supervised or directed them, with the exception of patient care issues.  (Sales Dep. 19-20, 77, 80-

81; Tafalla Dep. 146-49, 152-53.)  In that circumstance, the doctors of SPBN (as well as other

doctors at JFK) would provide orders pertaining to the manner of dialysis treatment to their

respective patients.  However, the evidence also showed that when Plaintiffs or other dialysis

nurses needed assistance performing their required dialysis tasks, they would turn to Ms.

Wilbanks for assistance.  (Sales Dep. 19-20; Tafalla Dep. 146-49.)  Thus, while the dialysis

nurses would rely on the doctors' orders in providing patient care, Ms. Wilbanks provided the

daily supervision over the workers.

### 3. Right to hire, fire or modify employment conditions

There is no evidence that SPBN had any right to hire, fire or modify employment conditions.  Mr. Sales testified that he was interviewed and hired by Ms. Wilbanks, not SPBN.  Furthermore, Mr. Sales asked Ms. Wilbanks to switch him from a flat rate of payment to an hourly rate.  Likewise, Ms. Tafalla testified that she spoke to Ms. Wilbanks about her salary and pay raises. (Sales Dep. 10, 81-82, 93-94; Tafalla Dep. 131, 226-27; Wilbanks Dep. 40-45.)  Thus, with respect to this factor, there is no evidence suggesting that SPBN acted as a joint employer.  Nonetheless, Plaintiffs claim that SPBN had the "ultimate power to fire every nurse at All Florida if All Florida was not performing well under SPBN's contract with JFK."  (Pl. Mot. at 14.)  Plaintiffs point, however, only speaks to SPBN's ability to terminate its contract with All Florida, and says nothing about SPBN's ability to fire individual dialysis nurses.

### 4.  Power to determine pay rates or methods of payment

In Antenor, the Eleventh Circuit explained that pay rate refers to the amount of compensation to be paid, benefits paid, and how these payments are allocated.  Method of payment refers to the "basis upon which a worker is paid, for example, by the hour or by the piece." Id. at 936.  Ms. Wilbanks made the determination to pay Mr. Sales a flat rate per treatment, and when Mr. Sales asked to be switched to an hourly rate, she approved his request. (Sales Dep. 10, 82, 93-94; Wilbanks Dep. 40-45.)   Plaintiffs approached Ms. Wilbanks, not SPBN for a raise. (Tafalla Dep. 226-27.)  Thus, this factor must be weighed against a finding of joint employment.  Nonetheless, Plaintiffs point to the slim profit margin between what All Florida paid the nurses and what SPBN paid All Florida as well as All Florida's policy to increase the nurses' pay if SPBN increased the rates paid to All Florida.  These facts, however,

14

do not give rise to a joint employment relationship.  See Aimable, 20 F.3d at 442 (finding no

joint employment relationship when a contractor refused to pay farm laborers more money unless

the contractor received more money from the farm when the evidence showed that the contractor

had exclusive control over the laborers' compensation).  The agreement between All Florida and

SPBN did not require that All Florida set compensation rates for the dialysis nurses at the same

rate of payment by SPBN to All Florida.  That circumstance resulted from a business decision

exclusively in the hands of All Florida.

     5. Preparation of payroll and payment of wages

     This factor tips heavily against a finding that SPBN was a joint employer.  Ms. Wilbanks

testified that All Florida used Paychecks as its payroll company and that Ms. Wilbanks would tell

Paychecks how much money to pay each dialysis nurse.  (Wilbanks Dep. 55-56, 60-62.)  There is

no evidence showing that SPBN was involved in the payment of wages to the nurses.  Plaintiffs,

however, note that the wages paid to the nurses by All Florida were equivalent to the amount

paid per treatment to All Florida from SPBN.  Additionally, Plaintiffs point out that SPBN paid

All Florida a few days prior to All Florida paying its workers.  According to Plaintiffs, this is

evidence of a "corporate sham" by which SPBN used All Florida to "pass through" wage

payments. (Pl. Mot. at 15.)  Noticeably absent is any evidence to support this theory by Plaintiffs

that All Florida and SPBN agreed to a "pass through" arrangement.  In fact, the record evidence

showed the opposite; i.e., that All Florida had exclusive control over payroll and payment of

wages.

6.  Ownership of facilities where work occurred

The parties agree that JFK owned the dialysis unit and that the contract between JFK and SPBN gave SPBN the right to operate the dialysis unit.  While Plaintiffs state that the dialysis nurses could not have provided dialysis services without SPBN providing All Florida the space, that does not change JFK's ownership of the facility. Therefore, this factor does not support a finding of joint employment.

7.  Performance of job integral to business

This factor weighs in favor of finding joint employment status.  Clearly, the business at issue was to provide dialysis services and there is no question that dialysis nurses were essential to providing that service.   Defendants do not directly challenge this conclusion. Instead, they claim that this factor has little probative value when considering skilled workers and point to language in Antenor which states that "a worker who performs a routine task that is a normal and integral part of the grower's production is likely to be dependent on the grower's overall production process." Id. at 937.  According to Defendants, the dialysis nurses did not perform a routine task, but a skilled task.  The Court, however, does not read Antenor as turning on the workers' level of skill but on whether the workers are part of an "integrated economic unit."  Id. Here, doctors would determine that a patient needed dialysis services and those patients would be directed to All Florida nurses to perform that service.  In that respect, the dialysis nurses performed as integral a function to SPBN as farmworkers who picked vegetables on land owned by the growers.

16

8. Investment in equipment and facilities

Defendants concede that All Florida had no investment in the equipment or supplies at the dialysis unit. (SPBN's Resp. at 9; All Florida Resp. at 10.)  The equipment was supplied by both JFK and SPBN and the supplies were provided by SPBN.  Therefore, this factor tips in favor of finding a joint employment relationship.

After careful consideration of all of these factors collectively, the Court finds Plaintiffs were not jointly employed by SPBN.   The overwhelming evidence shows that the dialysis nurses were economically dependent on All Florida, not SPBN.  While SPBN invested in the equipment for the dialysis nurses to perform their jobs, and those jobs were integral to the business, All Florida handled significantly more aspects of Plaintiffs' work.  All Florida interviewed and hired the nurses, supervised the dialysis nurses on a daily basis, approved pay raises, evaluated the nurses' work performance, managed and oversaw payroll, and set pay rates.  Based on this totality of circumstances, the Court finds that no joint employment relationship exists as a matter of law.

B.  Enterprise Coverage

The FLSA's overtime provision apply where an employee is engaged in commerce or the production of goods for commerce ("individual coverage") or where an employee works for an enterprise engaged in commerce or in the production of goods for commerce ("enterprise coverage").  29 U.S.C. § 206; see Ares v. Manuel Diaz Farms, Inc., 318 F.3d 1054, 1056 (11th Cir. 2003).  Plaintiffs seek to establish enterprise coverage for All Florida.   However, Plaintiffs are unable to show that All Florida is a covered enterprise due to the undisputed fact that All Florida's gross revenue did not exceed $500,000.00.  See 29 U.S.C. § 203(s)(1)(A)(ii). Thus, in

order to show that enterprise coverage exists, Plaintiffs must demonstrate that All Florida and SPBN were a single enterprise.

The FLSA defines "enterprise" as the "related activities performed (either through unified operation or common control) by any person or persons for a common business purpose." 29 U.S.C. § 203(r)(1).  To constitute a single enterprise, the following three elements must all exist: (1) related activities; (2) unified operation or common control and (3) common business purpose. Donovan v. Easton Land & Dev. Co., 723 F.2d 1549, 1551 (11th Cir. 1984).  This determination is a question of law for the Court to decide.  Reich v. Bay, Inc., 23 F.3d 110, 114 (5th Cir. 1994); Dunlop v. Ashy, 555 F.2d 1228, 1229 (5th Cir. 1977).[3]

(1) Related Activities

"Activities are related when they are the same or similar, when they are auxiliary and service activities, or a part of a vertical structure." Id. citing S.Rep. No. 145, 87th Cong., 1st Sess. 31, reprinted in 1961 U.S. Code Cong. & Ad. News 1620, 1660 (internal quotation marks omitted).  Here, the undisputed facts demonstrate that SPBN treats patients with kidney disease and All Florida provides dialysis services to SPBN's patients.  The Court finds that the these activities are "the same or similar."  See Chao v. A-One Med. Svcs., Inc., 346 F.3d 908, 915 (9th Cir. 2003) (finding two companies providing home health services were engaged in related activities).

---

[3] The decisions of the United States Court of Appeals for the Fifth Circuit, as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit.  Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

18

(2) Unified Operation or Common Control

The second element of enterprise coverage requires Plaintiffs to show that the related

business activities of All Florida and SPBN are conducted either "through unified operation or

common control."  29 U.S.C. § 203(r).  Common control is established by showing a controlling

ownership interest in a business and may also be shown by establishing "a common control

center with the ultimate power to make binding policy decisions for all units of the enterprise."

Dunlop v. Ashy, 555 F.2d at 1231;[4] Donovan, 723 F.2d at 1552.  Unified operation has been

defined by the Department of Labor as follows:

> Since the term "unified operation" has reference to the method of performing the related
> activities, it means combining, uniting, or organizing their performance so that they are in
> effect a single business unit or an organized business system which is an economic unit
> directed to the accomplishment of a common business purpose. The term "unified
> operation" thus includes a business which may consist of separate segments but which is
> conducted or operated as a unit or as a single business for a common business purpose.

29 C.F.R. § 779.217

Turning first to common control, the Court finds that the undisputed facts do not

demonstrate common control.  There is no evidence that SPBN had a controlling ownership

interest in All Florida.   All Florida is owned solely by Ms. Wilbanks.  Furthermore, Ms.

Wilbanks made all the policy decisions for All Florida.  For example, she alone interviewed and

hired the nurses, she managed the schedule for the nurses, set the rate of pay, managed payroll

and evaluated the nurses' performance.  See Dunlap, 555 F.3d at 1231 (restaurant manager who

---

[4] The decisions of the United States Court of Appeals for the Fifth Circuit, as that court
existed on September 30, 1981, handed down by that court prior to the close of business on that
date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and
the bankruptcy courts in the circuit.  Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir. 1981)
(en banc).

determined items on menu, the prices charged, hiring and firing of restaurant personnel and opening and closing hours made all policy decisions despite accepting some suggestions from motel manager and using the motel's safe to store the restaurant's daily receipts).  Based on these facts, the Court finds no common control by SPBN over All Florida.

Likewise, the Court finds that the business activities of All Florida and SPBN were not a unified operation. Unified operation requires showing "more than close cooperation and mutual assistance." Dunlop, 555 F.2d at 1234.  Factors to examine include intermingling funds, obtaining separate liability and workers' compensation insurance, ordering supplies separately, interchanging employees and operating with the same managers. Donovan, 723 F.2d at 1552. This factor is not as clear. The evidence shows no intermingling of funds, no interchanging of employees, no shared managers and no obtaining of workers' compensation insurance by SPBN by All Florida.  On the other hand, supplies were ordered by SPBN for All Florida and SPBN obtained professional liability insurance for the dialysis nurses.  Despite these two factors, weighing all the factors as a whole, the balance tips more heavily against a finding of a unified operation.  In any event, as will be discussed infra, Plaintiffs are unable to establish the final element of common business purpose. Thus, the Court need not resolve this issue.

(3) Common Business Purpose

This factor requires that Plaintiffs show "more than a common goal to make a profit" to satisfy this requirement. Donovan, 723 F.2d at 1554. Here, Plaintiffs argue that "since SPBN made a profit off every dialysis treatment All Florida provided . . . All Florida and SPBN's business purpose was completely aligned." (Pl. Mot. at 6.)  This argument, however, clearly runs afoul of Donovan.  Id.  In fact, Donovan went on to find that no common business purpose

20

where, like here, there was no intermingling of profits.  Id.  Based on this clear precedent, the Court finds no common business purpose between SPBN and All Florida.

The failure of Plaintiffs to establish, as a matter of law, that All Florida and SPBN are a single enterprise means that there is no enterprise coverage for All Florida. Thus, Plaintiffs can obtain no relief against this entity.

### IV.  Conclusion

Given that the Court has concluded, as a matter of law, that SPBN is not a joint employer and there is no enterprise coverage for All Florida, the remaining issues raised by Plaintiffs and Defendants All Florida Dialysis Services, Inc. and Majella  Wilbanks are rendered moot. Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

  (1)    Defendants Jose Arrascue and South Palm Beach Nephrology, P.A.'s Motion for Summary Judgment (DE 90) is **GRANTED**.

  (2)    Defendants All Florida Dialysis Services, Inc. and Majella  Wilbanks's Motion for Summary Judgment (DE 100) is **DENIED AS MOOT.**

  (3)    Plaintiffs Sherwil Tafalla and Joemar Sales' Motion for Summary Judgment (DE 103) is **DENIED**.

  (4)    The Court shall separately enter judgment for Defendants.

**DONE and ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 21st day of January 2009.

_____

KENNETH A. MARRA
United States District Judge